UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

UNITED STATES OF AMERICA,

-against-

DEVON BRISTOL,

                            Defendant.
-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**10-CR-36 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Defendant Devon Bristol ("Bristol") is charged with possession of a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1).  (Compl. (Docket Entry # 1); Indictment (Docket Entry # 6).)  Bristol was arrested when three police officers stopped a car in which he was a passenger and conducted a search of his person, during which they recovered a firearm.  Bristol has moved to suppress the firearm, all post-arrest statements, and any other evidence obtained by police upon his arrest, arguing that both the vehicle stop and the subsequent search of his person violated his Fourth Amendment rights.  (Docket Entry # 11.)

After additional briefing by both parties (Docket Entry ## 13, 14), the court conducted a suppression hearing on this issue on May 18, 2010 (see Docket Entry # 17).  At the hearing, the three police officers involved in Bristol's arrest testified.  Both parties provided supplemental post-hearing briefing (Docket Entry ## 20, 21, 33, 34); and, on March 25, 2011, the court heard oral argument (Docket Entry # 36).

For the reasons stated below, Bristol's motion to suppress is GRANTED.

**I.    FACTS**

On December 30, 2009, New York Police Department ("NYPD") Officers Trent Narra and Sam Cabrera, and Sergeant Eric Konoski (collectively "the Officers") were on patrol in an

1

unmarked car in Brooklyn, New York. (Suppression Hearing Transcript ("Tr.") 10-11; 82; 112.) The Officers were assigned to the Police Service Area 2 Anti-Crime Unit, and they were working a 6:00 p.m. to 2:00 a.m. shift. (Tr. 6, 9-10.) Officer Narra was driving, Sergeant Konoski was in the front passenger seat, and Officer Cabrera was in the back seat. (Tr. 11; 83; 112.) Sergeant Konoski was the supervising officer. (Tr. 39.)

Prior to 1:30 a.m., the Officers pulled over six to eight vehicles. (Tr. 12, 83.) None of the Officers was able to recall any specific stop in detail or testify as to the exact number of vehicles stopped. The Officers did not issue any citations or make any arrests, nor did they make a written record of any of these six to eight stops. (Tr. 46-47, 88.)[1]

At approximately 1:30 a.m., the Officers were at a stop sign, facing southbound at the corner of Saratoga Avenue and Halsey Street. (Tr. 13, 84, 113.) They saw a gold Crown Victoria ("the car") make a left turn from Halsey Street onto Saratoga Avenue, and begin driving southbound on Saratoga Avenue in front of them.[2] (Tr. 13, 99, 113.) The car had New Jersey license plates, no exterior markings, two passengers in the back seat, and no one in the front passenger seat. (Tr. 13-14, 113.) It was operating safely and in accordance with traffic laws. (Tr. 101.) As the car passed, the Officers were able to observe only silhouettes of the vehicle's

---

[1]     The Officers claimed that they pulled over some of these six to eight vehicles based on traffic infractions, and others based on the vehicles' participation in the Taxi/Livery Robbery Inspection Program (TRIP). (Tr. 12, 47, 83; see also Def. Reply (Docket Entry # 14) at 4-5.) TRIP is a voluntary program for taxi and livery cab drivers, aimed at improving drivers' safety; participants in the program affix stickers to the exterior of their vehicles, signifying their participation in the program and their agreement to allow police to pull them over for random cab safety checks. (See Def. Reply at 4-5; Tr. 42-44.) Although the Government initially suggested that the Officers stopped the gold Crown Victoria as part of this program (see Gov't Opp. (Docket Entry # 13) at 2), there is no evidence that the car was actually part of TRIP (see, e.g., Tr. 51 (car did not have TRIP sticker); see also Def. Reply at 4-5), and the Government abandoned this justification after the suppression hearing (see Gov't Post-Hearing Opp. (Docket Entry # 21)). The court finds the Officers' accounts of their activities prior to 1:30 a.m. doubtful at best.

[2]     The court refers to the car as "gold" herein, as did Sergeant Konoski (Tr. 13) and Officer Narra (Tr. 113). Officer Cabrera referred to the color of the vehicle as "tan." (Tr. 84.)
        The court notes that nothing in the Officers' testimony indicates the car's model year or its approximate age (see Tr. 49 (Konoski stating he did not know age of vehicle)), nor was the Government able to provide such information to the court at oral argument when asked (see March 25, 2011 Motion Hearing Tr. (Docket Entry # 36)).

occupants. (Tr. 50.) They were not able to see the occupants' faces, identify their races or genders, or identify their approximate ages. (Tr. 49-50, 100.) The Officers observed no unusual behavior, and did not recognize any of the occupants. (Tr. 49-50, 100.) None of the Officers had seen the car before. (Tr. 49, 100.)

Based on his observations, Officer Narra had a "hunch" that the car was operating as an unlicensed livery cab in violation of New York City Administrative Code § 19-506(b)(1).[3] (Tr. 15, 137-39.)[4] At Officer Narra's suggestion, the Officers decided to pull the vehicle over. (Tr. 14-16; 85; 103; 137-39.)

When the car stopped, Officer Narra approached the driver's side, Officer Cabrera approached the rear, and Sergeant Konoski approached the passenger side. (Tr. 11, 83, 112.) Defendant Devon Bristol was seated in the rear passenger-side seat. (Tr. 60.) As the Officers approached, Bristol opened the rear passenger door and attempted to exit the vehicle. (Tr. 17, 60.) Sergeant Konoski stood in the opening of the door, put his right hand on the door, and said, "You don't have to get out of the car." (Tr. 17-18, 63, 69-70.) Sergeant Konoski did not, however, order Bristol to remain in the vehicle. Bristol reiterated that he wanted to leave. (Tr. 19, 66.) When Sergeant Konoski maintained his position and again told Bristol that he did not

---

[3] Section 19-506(b)(1) prohibits the operation of for-hire vehicles without a license:

> Any person who shall permit another to operate or who shall knowingly operate or offer to operate for hire any vehicle as a taxicab, coach, wheelchair accessible van or for-hire vehicle in the city, without first having obtained an appropriate license therefor, shall be guilty of a violation hereof, and upon conviction in the criminal court shall be punished by a fine of not less than four hundred dollars or more than one thousand dollars or imprisonment for not more than sixty days, or both such fine and imprisonment.

[4] Officer Narra initially told prosecutors that he had a "hunch" that the car was an unlicensed livery cab. (Gov't Disclosure Letter dated May 17, 2010 (Docket Entry # 16); Tr. 138.) At the suppression hearing, he testified that he had "reasonable suspicion," but then again affirmed his earlier statement that his suspicion was based on "a hunch." (Tr. 137-39.)

3

need to leave the vehicle, Bristol attempted to walk past him. (Tr. 19, 68-69.)[5] According to Sergeant Konoski's testimony, Bristol's chest bumped against Konoski's forearm as Bristol exited the vehicle. (Tr. 70.) Sergeant Konoski claims that, through Bristol's leather jacket, he was able to feel a "hard, heavy object" that he identified as "consistent with a firearm." (Tr. 70.)[6] Konoski asked Bristol to stop, saying "I want to make sure you don't have any weapons on you." (Tr. 70.) Bristol kept walking, and Konoski tackled Bristol to the ground. (Tr. 70-72, 87.) Upon searching Bristol's person, Sergeant Konoski recovered a loaded nine millimeter hi-point semi-automatic pistol. (Tr. 72, 87-88, 115.)

---

[5] Although the court credits the testimony that Bristol attempted to exit the vehicle and leave the scene of the stop, it must emphasize that the facts do *not* show that this attempt amounted to headlong flight. C.f. United States v. Baldwin, 496 F.3d 215, 220 (2d Cir. 2007). Nor is there any support in the record for the Government's characterization of Bristol's actions as "aggressive." (See Gov't Opp. at 10 (arguing without support that "defendant's aggressive actions while getting out of the vehicle . . . created reasonable suspicion").)

[6] The court does not credit this aspect of Sergeant Konoski's testimony. Where an officer feels or notices an unusual bulge in a detainee's pocket, this fact can justify a frisk. See, e.g. United States v. Rahman, 189 F.3d 88, 120 (2d Cir. 1999) (officer felt "firm rectangular object" which he reasonably suspected "might be a plastic explosive"); United States v. Hamilton, 978 F.2d 783, 785 (2d Cir. 1992) (officer saw "bulge" in defendant's pants, which justified a pat down). However, the court finds this aspect of Sergeant Konoski's testimony implausible, and declines to find that he actually felt a bulge consistent with a weapon.

Only Sergeant Konoski was in a position to directly observe Bristol's conduct when exiting the vehicle, and Konoski's testimony about the encounter leading up to the frisk was not reliable. Sergeant Konoski's demeanor at the suppression hearing was defensive and his answers about his conduct before and during the vehicle stop were less than forthright. The court was troubled by the Officers' coordinated falsification of their memo book entries, all three of which incorrectly gave the address of a nearby public housing project as the site of the arrest. (Tr. 56-57, 91-93, 130-31; see also Def. Post-Hearing Reply (Docket Entry # 33) at 2-3.)

Furthermore, Sergeant Konoski has been the subject of a series of departmental investigations into his conduct as a police officer, including his improper conduct with regard to searches and seizures. (See Def. Post-Hearing Reply at 1-3.) Sergeant Konoski has been with the New York City Police Department for eight years. (Tr. 5.) In this time, the Civilian Complaint Review Board has unanimously substantiated two complaints against him, both of which involved stop-and-frisks. (Tr. 6-9, 32.) In one instance, the Review Board found that Sergeant Konoski improperly frisked a 13-year-old boy. (Tr. 32-36.) During the course of the present litigation, the Government informed the court that Sergeant Konoski is now under investigation again. (Tr. 3; Motion Hearing Tr.; Gov't Letter Regarding Status of Witnesses (Docket Entry # 36).) The Government has informed the court that the NYPD is currently investigating Sergeant Konoski and Officer Narra on charges that include entering a woman's home without authorization (see Tr. 3), making improper memo book entries, and corruption. (Gov't Letter Regarding Status of Witnesses at 1.) In February of this year, Sergeant Konoski was transferred to the Fleet Services Division (a non-patrol position) due to the now-pending charges. (Tr. 26-27.) This record undermines Sergeant Konoski's credibility and the court's confidence in his judgment, and his attitude about these charges at the hearing was disturbing. He acknowledged no wrongdoing even with regard to those complaints that have been substantiated, he claimed not to recall why the frisk of the 13-year-old had been unauthorized, and he claimed not to remember how many total complaints had been filed against him or what the allegations entailed. (Tr. 31, 38.)

4

Bristol was arrested and subsequently charged with possession of a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1).[7] The Officers did not learn whether or not the gold Crown Victoria was operating as an unlicensed livery cab. (Tr. 73-74, 102, 110.) They did not run a license and insurance check of the driver, run a check of the car's license plate, or otherwise investigate the matter. (Tr. 22, 49, 102, 135; Gov't Opp. at 7, n.4.)[8] In their paperwork, all three Officers listed the site of the arrest as 55 Saratoga Avenue, approximately three blocks away from the location where it actually took place.[9] (Tr. 56-57, 91-93, 130-31.)

## II. DISCUSSION

In his Motion to Suppress, Bristol argues that both the vehicle stop and Sergeant Konoski's subsequent search of his person violated his Fourth Amendment rights. (Docket Entry # 11.)

### A. Legal Standard

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Whren v. United States, 517 U.S. 806, 809 (1996); see also Arizona v. Johnson, 129 S. Ct. 781, 786 (2009) ("Most traffic stops . . . resemble, in duration and atmosphere, the

---

[7] Bristol has prior convictions for Attempted Robbery in the Second Degree and Criminal Possession of a Weapon in the Second Degree. (Gov't Post-Hearing Opp. at 1, n.1.)

[8] Even if the Officers were mistaken about the car being an unlicensed livery cab, this fact would not undermine the legality of an otherwise valid stop. Unites States v. Stewart, 551 F.3d 187, 193 (2d Cir. 2009) ("[A] mistake of fact does not undermine the existence of reasonable suspicion."); United States v. Jenkins, 452 F.3d 207, 212 (2d Cir. 2006) ("The constitutional validity of a stop is not undermined simply because the officers who made the stop were mistaken about relevant facts.")).

[9] 55 Saratoga Avenue is the address of a public housing project. (Tr. 57.) There is no evidence in the record that this Brooklyn neighborhood is a high-crime area.

kind of brief detention authorized in Terry [v. Ohio, 392 U.S. 1 (1968)].") (internal quotation omitted). A vehicle stop operates as a seizure of the driver *and all passengers* for the duration of the stop. Brendlin v. California, 551 U.S. 249, 255-257 (2007) (holding that "during a traffic stop an officer seizes everyone in the vehicle, not just the driver"). Accordingly, a vehicle stop is constitutionally permissible only if it is reasonable. Whren, 517 U.S. at 810.

A vehicle stop is valid where police have, at minimum, a reasonable suspicion that the person stopped is committing or has committed a criminal offense. Johnson, 129 S. Ct. at 784. Reasonable suspicion of a traffic violation is sufficient to justify a stop. United States v. Stewart, 551 F.3d 187, 193 (2d Cir. 2009) (holding "unambiguously that the reasonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop" and noting that a majority of other circuits agree).[10]

Once a vehicle is stopped, concerns for officer safety can, in some circumstances, justify patting down a vehicle's occupants for weapons. See Johnson, 129 S. Ct. at 786. In order "to proceed from a stop to a frisk," however, a separate reasonableness inquiry is required: For a pat-down conducted following a lawful stop to be permissible, "the police officer must reasonably suspect that the person stopped is armed and dangerous." Id. at 784 (confirming that separate justifications are required for a vehicle stop and a subsequent frisk).

Reasonable suspicion requires "some minimal level of objective justification" for suspecting criminal activity. United States v. Sokolow, 490 U.S. 1, 7 (1989). "Although an

---

[10] In Stewart, the Second Circuit overturned a decision of the district court which held that in order to justify a vehicle stop, the officers must have (1) probable cause of a traffic violation, or (2) reasonable suspicion that more serious criminal activity may be afoot. Stewart, 551 F.3d at 190, vacating and remanding United States v. Stewart, 491 F. Supp. 2d 423, 425 (S.D.N.Y. 2007). The circuit clarified that either probable cause *or* reasonable suspicion of a traffic violation provide a sufficient basis for a stop. 551 F.3d at 191. The court further stated that the principle announced was consistent with its past decisions in Jenkins, 452 F.3d at 212, and Holeman, 425 F.3d at 189, as well as with the decisions of a majority of other circuits. 551 F.3d at 191.

6

officer's reliance on a mere 'hunch' is insufficient, . . . the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 (2002) (citing Sokolow and Terry); see also Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000) ("[T]he Fourth Amendment requires at least a minimal level of objective justification for making [a Terry] stop. The officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity."). This means that, at both the stop and the frisk stages of a vehicle stop, an officer's suspicion must be "based on specific and articulable facts, of unlawful conduct" in order to be consistent with the Fourth Amendment. United States v. Scopo, 19 F.3d 777, 781 (2d Cir. 1994) (internal quotations and citations omitted).

A court may take into account a police officer's law enforcement training and experience in determining the objective reasonableness of his suspicion. See United States v. Villegas, 928 F.2d 512, 516 (2d Cir. 1991) (finding reasonable suspicion where "suspicious" conduct observed by law enforcement would have been "innocuous to the untrained eye"). But whether reasonable suspicion exists is "an objective inquiry; the 'actual motivations of the individual officers involved' in the stop 'play no role' in the analysis." Holeman, 425 F.3d at 190 (quoting Whren, 517 U.S. at 813). Additionally, the court may not consider individual facts in isolation from one another, but must assess reasonable suspicion based on the "totality of the circumstances." Arvizu, 534 U.S. at 273.

"The Government bears the burden of proving, by a preponderance of the evidence, that reasonable suspicion existed for a stop." United States v. Stewart, 604 F. Supp. 2d 676, 680 (S.D.N.Y. 2009) (internal quotations omitted); see also United States v. Dorlette, 706 F. Supp. 2d 290, 297 (D. Conn. 2010). If the Government fails to satisfy this burden, any evidence obtained

as a result of an improper seizure—that is, a stop or frisk that is not supported by reasonable suspicion—must be excluded from trial. See Wong Sun v. United States, 371 U.S. 471, 484-88 (1963); United States v. Harrell, 268 F.3d 141, 148 (2d Cir. 2001) ("Evidence seized based on an unreasonable traffic stop 'is subject to the poisonous tree doctrine, and may be suppressed.'" (quoting Scopo, 19 F.3d at 781)).

### B. Vehicle Stop

The court first considers whether the stop of the gold Crown Victoria was supported by reasonable suspicion that it was an unlicensed livery cab, operating in violation of New York City Administrative Code § 19-506(b)(1).

Both Officers Cabrera and Narra testified that it was Narra who first suggested stopping the gold Crown Victoria. (Tr. 85, 137.) In explaining his reasoning for this suggestion, Officer Narra initially told prosecutors that he had a "hunch" that the car was an unlicensed livery cab (Gov't Disclosure Letter dated May 17, 2010 (Docket Entry # 16)), a position that he reiterated on cross-examination (Tr. 138). An officer's "hunch" is insufficient to support reasonable suspicion. Arvizu, 534 U.S. at 274 (citing Terry).

At the suppression hearing, however, Narra and the other Officers recounted additional circumstances that the Government contends rendered their suspicion of the car reasonable. (See, e.g., Tr. 113-14.) These factors were (1) that two passengers were riding in the back seat of the car, while no one was riding in the front passenger seat; (2) that Crown Victorias and other large sedans are among the types of vehicles commonly used as livery cabs; (3) that the car had

8

New Jersey license plates; and (4) that the car had no signage indicating that it was a licensed livery cab.[11] Even taken together, these factors do not amount to reasonable suspicion.[12]

The arrangement of two passengers in the back of the car with no passenger in the front is a relevant factor in the court's analysis, but this fact is insufficient to support reasonable suspicion of a violation of § 19-506(b)(1). People sit two-to-the-back for a wide range of ordinary and lawful reasons.[13] By the Officers' own admissions, they had no way—based on their observations of the driver and passengers—of determining whether the car's occupants were engaged in lawful activity or a traffic violation. The Officers could see only the positioning

---

[11] The Officers' explanations of their reasons for the stop differed from one another. (Compare Tr. 14 (Konoski) with Tr. 84 (Cabrera) and Tr. 114 (Narra).) The court addresses the above three factors as the Officers' collective reasons for forming suspicion, although not every Officer cited every one of these facts as significant.
  In its post-hearing briefs, the Government states one additional fact that it argues supports a reasonable suspicion: that the arrest occurred in an area of Brooklyn where "there are no yellow cabs." (Gov't Post-Hearing Opp. at 9.) Although it *may* be the case that more livery cabs operate in areas with fewer yellow cabs, the Government has provided no testimony or other evidence to this effect. Nothing in the record suggests that areas without yellow cabs have higher rates of licensed or unlicensed for-hire vehicles, nor has the Government offered any other evidence that an absence of yellow cabs should have aroused reasonable suspicion. Accordingly, the court cannot credit this factor.

[12] Unlike the instant case, a number of cases in which the Second Circuit has considered whether reasonable suspicion of a traffic violation exists have involved officers' direct observations of the alleged violations. See, e.g., Stewart, 551 F.3d at 188-89 (officers testified that they saw vehicle illegally encroaching on the crosswalk while stopped at a red light), remanded Stewart, 604 F. Supp. 2d at 684 (finding suspicion on this basis objectively unreasonable); Jenkins, 452 F.3d at 212 (finding reasonable suspicion of a traffic violation where officers believed they saw missing rear license plate). By contrast, the Officers' suspicion here was not based on direct observation. None of the Officers saw—or thought they saw—a hail or other exchange that could be understood as tantamount to an observation of the purported violation itself. Rather, the justification advanced here is more analogous to that in cases like Holeman, 425 F.3d at 191, in which the court considered the cumulative effect of indirect indicia of a traffic violation.

[13] Among the numerous lawful reasons why passengers might arrange themselves in this configuration are because they have dropped off a front-seat passenger and chosen not to rearrange, because the passengers want more leg room or to talk to one another, because a spill or seatbelt problem makes the front passenger seat undesirable, because the passengers are two teenagers, or because the passengers are two elderly adults. Of course, the fact that purportedly suspicious circumstances could be explained by lawful behavior does not necessarily undermine reasonable suspicion. See Holeman, 425 F.3d at 191. These alternate possibilities do, however, highlight the various circumstances in which vehicle stops based entirely on two-to-the-back seating arrangements would impinge on the ordinary and lawful activities of a wide variety of travelers.

of the passengers, not any other characteristic of the vehicle's occupants.[14] The court notes that although the "balance between the public interest and the individual's right to personal security, tilts in favor of a lesser standard than probable cause" in investigatory vehicle stops, Arvizu, 534 U.S. at 273 (internal quotation omitted), police do "not have unbridled discretion to make [] investigatory stop[s]," United States v. Nargi, 732 F.2d 1102, 1104 (2d Cir. 1984). To permit the seating positions of passengers alone to create reasonable suspicion would expose many innocent travelers to near-random searches.

Although an investigatory stop based on a two-to-the-back seating arrangement alone falls short of satisfying the reasonable suspicion standard, the court must consider the passengers' seating arrangement in light of the totality of the circumstances surrounding this stop. The other facts the Government advances provide little additional support for the purported reasonableness of the Officers' suspicion. First, the Officers testified based on their training and experience that large sedans such as Crown Victorias are among the types of vehicles frequently used as livery cabs. (See, e.g., Tr. 52.) The Officers also acknowledged, however, that their training and experience has shown them that all varieties of makes and models—including SUVs, vans, station wagons, trucks, and sedans—can be and are frequently used for this purpose. (See, e.g., Tr. 102 (Cabrera testifying that she has seen all types of vehicles, including a Nissan Altima and a Mercedes Truck, operating as livery cabs).) The Officers further testified that Crown Victorias are commonly used as personal, not-for-hire vehicles as well. (Tr. 53.) And, none of their testimony drew a distinction between older and newer models, or gold vehicles

---

[14] The Officers testified that they could not see the age, race, gender or any other identifying features of the passengers (see, e.g., Tr. 50 (Konoski stating "I just saw silhouettes")), nor did the Officers witness any of the car's occupants exhibit nervousness or unusual behavior before the stop (Tr. 50).

10

versus vehicles of other colors. On this record, at this level of generality, the type of vehicle is a weak factor which does little to contribute to the reasonableness of the Officers' suspicion.

Second, at oral argument, the Government argued that the fact that the car had out-of-state license plates further contributes to the reasonableness of the Officers' suspicion. (See Motion Hearing Tr.) The court received testimony that the Crown Victoria had New Jersey license plates. (See Tr. 102, 114.) It is far from apparent to the court, however, how out-of-state plates, particularly from a neighboring state such as New Jersey, with which there is a considerable exchange of interstate traffic, contribute to an inference that the car was an unlicensed livery cab.[15] The Officers provided no indication why out-of-state plates might contribute to reasonable suspicion in this context, and none of the Officers testified that anything in their training or experience has shown them that out-of-state vehicles commonly operate as for-hire vehicles. The court does not credit any suggestion that seeing a car from New Jersey driving in Brooklyn is anything but commonplace, and finds that even in combination with other factors the car's out-of-state plates are innocuous.

The final factor that the Government advances also adds nothing in terms of the objective reasonableness of the Officers' suspicion. The Officers testified that the car had no signage or other marking that indicated that it was a livery cab. (Tr. 101.) The Government argues that the absence of such signage indicates that it was likely operating as an unlicensed livery cab. (Gov't

---

[15] In United States v. Bayless, 201 F.3d 116, 134 (2d Cir. 2000), the Second Circuit considered out-of-state license plates salient in the context of a suspected drug transaction. However, the court noted that this factor would be "innocuous" were it not for additional, weightier factors present in that case. Id. (suggesting that, in other circumstances, giving *any* weight to out-of-state plates would "perhaps [be] inappropriate"). Most importantly, in Bayless, the court relied heavily on the fact that police witnessed suspects quickly loading duffle bags into a vehicle, a circumstance that was alone weighty enough to support their suspicion. Id. In the instant case, no similarly weighty factor exists. Additionally, out-of-state plates have a different meaning in the context of suspected drug trafficking (a crime that typically involves interstate exchange) as opposed to the suspected operation of an unlicensed livery cab (which does not).

Post-Hearing Opp. at 7l.) Such an inference presumes that the car was a livery vehicle, a contention that the court has rejected.

In sum, the facts surrounding the vehicle stop are insufficient to support an objectively reasonable suspicion, even when considered in their totality. The circumstances the Government has explicated "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." Reid v. Georgia, 448 U.S. 438, 448 (1980). Because the Government has failed to meet its burden of showing that reasonable suspicion of a traffic violation existed, the court finds the stop of the Crown Victoria unlawful on these facts.

**C. Search of Defendant's Person**

Because the vehicle stop in this case was impermissible, the Officers' search of Bristol's person and the subsequent seizure of the firearm are tainted as fruit of the poisonous tree. See, e.g. United States v. Santiago, 950 F. Supp. 590, 594 (S.D.N.Y. 1996) ("If the stop is unconstitutional, the resulting search and seizure is tainted as fruit of the poisonous tree.") (citing Wong Sun v. United States, 371 U.S. 471 (1963)).[16]

---

[16] The Government has not argued that the connection between the unlawful stop and the discovery of the firearm on Bristol's person has "become so attenuated as to dissipate the taint," Wong Sun, 371 U.S. at 491 (quotations omitted), nor could they have successfully made such a claim on this record. Sergeant Konoski's frisk occurred immediately following an unreasonable stop and no other circumstances intervened. See United States v. Traska, 111 F.3d 1019, 1027 (2d Cir. 1997) (discussing factors courts must consider in determining whether taint has been alleviated); United States v. Olavarria, No. 09 Cr. 870 (PGG), 2011 WL 1529190, *8-9 (S.D.N.Y. April 20, 2011) (granting motion to suppress and finding that defendant's post-stop conduct—an alleged five-minute-long altercation between defendant and the arresting officer—did not attenuate the connection between an unlawful traffic stop and the seizure of a firearm).

## III. CONCLUSION

For the foregoing reasons, the Government has failed to meet its burden of demonstrating that there was reasonable suspicion that justified the vehicle stop. Defendant Devon Bristol's motion to suppress is GRANTED, and the firearm and all fruits of the poisonous tree shall be excluded at trial. See Wong Sun, 371 U.S. at 484-88.

SO ORDERED.

Dated: Brooklyn, New York
      September 2, 2011

/s/ Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge